UNITED STATES *v.* M. BERNSTEIN & SONS (No. 3402)[1]

United States Court of Customs and Patent Appeals, November 27, 1931

*Charles D. Lawrence*, Assistant Attorney General, for the United States.
*Barnes, Richardson & Halstead* for appellee.

[Oral argument October 7, 1931, by Mr. Barnes and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This case was originally heard by this court on April 3, 1931, and in a decision rendered on April 27, 1931, Judge Garrett dissenting, the judgment of the Customs Court was reversed. 19 C. C. P. A. (Customs) 59, T. D. 44895.

Within the time fixed by the rules of this court, appellee filed an application for a rehearing, which application was granted, and the case was reargued on October 7, 1931.

We have given careful consideration to the arguments presented upon rehearing and find no reason to change our original decision. For the reasons stated in said decision, the judgment of the lower court is *reversed*.

### DISSENTING OPINION

BLAND and GARRETT, Judges: The merchandise involved in this appeal consists of dogskins, dressed. They were assessed for duty at 25 per centum ad valorem as "Furs dressed on the skin," under the provisions of paragraph 1420 of the Tariff Act of 1922. Appellee protested the classification, and the claim with which we are concerned here is that the merchandise was dutiable by similitude to plates and mats of dogskins under said paragraph 1420 at 10 per centum ad valorem.

---

[1] T. D. 45340.

Paragraph 1420 reads as follows:

PAR. 1420. *Furs dressed on the skin,* excepting silver or black fox furs, not advanced further than dyeing, 25 per centum ad valorem; *plates and mats of dog and goat skins,* 10 per centum ad valorem; manufactures of furs, excepting silver or black fox, further advanced than dressing and dyeing, prepared for use as material, joined or sewed together, including plates, linings, and crosses, except plates and mats of dog and goat skins, and articles manufactured from fur, not specially provided for, 40 per centum ad valorem; silver or black fox skins, dressed or undressed, and manufactures thereof, not specially provided for, 50 per centum ad valorem; articles of wearing apparel of every description partly or wholly manufactured, composed wholly or in chief value of hides or skins of cattle of the bovine species, or of dog or goat skins, and not specially provided for, 15 per centum ad valorem; articles of wearing apparel of every description wholly or in part manufactured, composed wholly or in chief value of fur, not specially provided for, 50 per centum ad valorem. (Italics ours.)

The United States Customs Court sustained the protest and the Government appealed here.

On April 27, 1931, this court, in *United States* v. *M. Bernstein & Sons,* 19 C. C. P. A. (Customs) 59, T. D. 44895, Garrett, J., dissenting, reversed the decision of the United States Customs Court.

This case involves the proper construction of the same paragraph of the Tariff Act of 1922 as was involved in the decision of *Transport Co.* v. *United States,* 15 Ct. Cust. Appls. 89, T. D. 42159, and in deciding this case the court felt compelled to follow the construction given the controverted paragraph in the *Transport* case. In that case, dressed and dyed kid skins were under consideration.

Subsequent to our decision in the case at bar, the appellee filed a petition for a rehearing of the cause, which was granted. Extended arguments by counsel on both sides were heard, and two briefs on each side were filed. It was at once recognized that if the construction given to the paragraph in the *Transport* case was adhered to, it was controlling of our decision in the case at bar.

The record in the case at bar and the briefs filed by counsel are large and voluminous and present a situation which was not presented in the *Transport* case.

In the *Transport* case the court felt that the rules of construction therein relied upon pointed to the correct congressional intent in the use of the terms in the paragraph in controversy and that such rules were controlling. The questions involved there have been discussed at much greater length and with much fuller citation of authorities, and while we might still agree to the view that under the record in that case the rules of construction relied upon were controlling, we are of the opinion that owing to the pertinent matters presented in the new record, the reasons which brought us to the conclusion in the *Transport* case should not prevail and control the decision in the instant case.

In the case at bar the importer has made one of the strongest cases of legislative sanction of administrative practice that has been before this court. Also there is involved the question of legislative sanction of judicial interpretation. We do not feel that it is necessary for us to discuss the question of legislative adoption of judicial decision. We said in the *Transport* case, *supra*, that the decisions upon which the claimed legislative approval might rest were in conflict. We would hesitate to apply the doctrine of legislative adoption of judicial decision where the decisions were of such character as to leave substantial doubt that Congress, when it enacted the paragraph, fully understood and appreciated the effect of such judicial holdings. In the case at bar, upon rehearing, decisions additional to those cited and discussed in the *Transport* case have been cited.

The result of the *Transport* case and of the case at bar, under the majority holding, is that dogskins, dressed, are held to be dutiable at 25 per centum ad valorem as furs, dressed, while dogskins, dressed, and made into plates and mats, are dutiable at 10 per centum ad valorem. This resulted in such an anomaly in tariff classification that the court in the *Transport* case and the case at bar called attention to the fact, but, as the record was presented in the *Transport* case, we saw no way of avoiding such result.

A consideration of the facts and citations presented and the arguments made, we think, now points out a way whereby this anomalous result may be avoided and justice be done to the parties without doing violence to or impairing the usefulness of the well-settled rules of construction which have so often been helpfully employed by the courts.

We do not regard it as necessary to extend this dissent by setting out in great detail the proven or admitted facts with reference to legislative adoption of administrative practice so fully as is shown in the record. It is sufficient to say that the record clearly shows that beginning with the receipt of the Treasury Department's decision, T. D. 34237, by the collector at the port of New York on the 19th day of February, 1914, dressed dogskins were thereafter continually classified for duty at said port by similitude to plates and mats, and assessed with a 10 per centum ad valorem duty thereunder, and that no change in this practice was made until after the passage of the Tariff Act of 1922 and until November 19, 1927, when the Treasury Department directed a change in classification in T. D. 42399, owing to the weight it gave to certain "judicial rulings" which had been suggested by the appraiser (the *Transport* case having been decided on April 16, 1927).

In this case it has been pointed out by the appellee that in the Summary of Tariff Information, 1920, which was before Congress at

the time it enacted paragraph 1420 of the Tariff Act of 1922, the following information was therein contained:

*Interpretation and Comments:* Dressed animal skins with the wool or hair on, when unprofitable to separate the wool from the skin, if devoted to fur uses, such as sheepskins, sheep crosses, or rectangles, are dutiable as fur skins under 8 Ct. Cust. Appls. 87.

Kid-skin crosses are within the paragraph as manufactures of fur prepared for use as material "and not as plates and mats of goatskin."

With proof that kid skins and goatskins are different things commercially, the provision for goatskin articles will be held not to include kid-skin articles.

With proof that crosses and plates as completed articles made of fur skins have distinct meanings, a cross can not be dutiable as a plate under this paragraph. 9 Ct. Cust. Appls. 4, T. D. 37842.

*Dressed goatskins and dogskins are dutiable at 10 per centum by similitude to goatskins and dogskins, plates and mats under the second provision of this paragraph, there being no provision in the tariff which includes them directly* (G. A. 7569, T. D. 34493 of 1914, Abstract 36623 of 1914, T. D. 34237 of 1914). (Italics ours.)

With this information before Congress, if it desired to have dogskins classified as furs on the skin at 25 per centum ad valorem, it would seem obvious that it would have used some new language in the paragraph to have brought about this result. It is fair to assume that the framers of the paragraph had in mind that, as dogskins were classified by similitude with plates and mats and assessed with 10 per centum duty under the prior act, it was not necessary to make any change in language in this respect to continue the same result. We must presume that Congress knew, not only what was stated in the above-quoted tariff information, but that it had full knowledge of the long-continued administrative practice at the port of New York, where this record shows from 75 to 90 per centum of such dogskins were imported. (The record contains no evidence that they were classified otherwise elsewhere.)

This court and other courts have gone a long way in giving force and effect to the doctrine of legislative sanction of administrative practice. The books are so full of pertinent decisions on the question that we deem it superfluous to cite and discuss many of the same.

In *United States* v. *Francklyn,* 4 Ct. Cust. Appls. 54, T. D. 33306, a situation arose quite comparable to the one at bar, in which the court, at first, decided the case adversely to the contentions of the Government. The Government petitioned for a rehearing and set out new matter not considered by the court in its former decision, and this court changed its former holding and said:

On the first consideration of this case, we reached the conclusion that the rate of duty should be ascertained without adding to the value of the importation the value of the coverings, holding that when the rate was ascertained this was to be spread upon not only the cement, but also its value as increased by the value of the coverings and other charges.

A rehearing has been granted in the case, and this question has been discussed at much greater length and with much fuller citation of authorities, and while still adhering to the view that, were this question one of first impression, there is great force in the view contended for by the importer here and first adopted by this court, we feel constrained to depart from our former holding, and upon the ground of legislative adoption of a long-continued customs practice and of decisions of the Board of General Appraisers, hold that the contention of the Government should prevail.

On a great many occasions this court and other courts have found it necessary, especially upon reconsideration of new matters not presented in the former case, to reverse its position. *United States* v. *American Sponge & Chamois Co.*, 16 Ct. Cust. Appls. 61, T. D. 42731; *United States* v. *Field & Co.*, 15 Ct. Cust. Appls. 254, T. D. 42263; *United States* v. *Doragon Co.*, 13 Ct. Cust. Appls. 182, T. D. 41051; *Legal Tender Cases*, 12 Wall. 457, 554; *Motion Picture Co.* v. *Universal Film Co.*, 243 U. S. 502, 518.

The rule of legislative adoption of long-continued administrative practice has always been regarded by the courts as the *master rule* of statutory interpretation and many well-considered cases in terms announce it as the master rule.

In *Brennan* v. *United States*, 136 Fed. 743, 746, the court said:

However, notwithstanding the great weight given in customs cases to the two rules of interpretation, which, as we have said, are relied on on the one side by the United States, and on the other by the importer, *there is another rule which masters them both.* Wherever, in the history of customs laws, it is found that a certain expression has received, in effect, a statutory construction, or a long and uniform use by Congress or by the departments, that construction is controlling, unless some other is necessary. (Italics ours.)

In *United States* v. *Borgfeldt & Co.*, 7 Ct. Cust. Appls. 367, 370, T. D. 36909, this court said:

It was declared by this court in an early decision, *Goussios & Co. et al.* v. *United States* 2 Ct. Cust. Appls. 317, T. D. 32051, that the rule of administrative construction is a *master rule.* That rule has been so often reaffirmed and applied by this and the Supreme Court that its determinative force, where applicable, can not be questioned. (Italics quoted.)

The court, therefore, is of the opinion that *there has been such a legislative, administrative, and judicial construction rating the parts of such combinations separately for dutiable purposes, long established and uniformly-continued, that it can not, except in violent and unwarranted disregard of well-settled rules of statutory construction,* do other than hold such parts separately dutiable and reverse the contrary decision of the Board of General Appraisers. (Italics ours.)

In *John Rothschild & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 442, 447, 448, T. D. 43190, this court said:

With reference to long-continued administrative practice the Government's contention in its brief is as follows:

Long-established practice is a *master rule,* and article 243 of the Customs Regulations of 1923, being founded partly on T. D. 23367, which was a ruling made by

the Treasury Department, November 20, 1901, on shipments from bonded warehouses in the United States to Guam, it follows that 27 years' practice by the United States Customs Court is sufficient to justify the doctrine always held by this court that "reasonable regulations of the Secretary of the Treasury made in pursuance of law are entitled to and have the force of law."

*Penick & Ford* v. *United States*, 12 Ct. Cust. Appls. 432, T. D. 40611; *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, T. D. 41548. (Italics ours.)

The authorities last cited by the Government seem to support that part of its contention that reasonable regulations of the Treasury Department made in pursuance of law have the force and effect of law. But we find abundant support for the applicability of the doctrine of long-established administrative practice in a case quite similar in character to the one at bar in *Swan & Finch Co.* v. *United States*, 190 U. S. 143.

In giving force and effect to the rule of legislative adoption of administrative practice and administrative construction, the courts have used many expressions indicating how persuasive this rule must be regarded in determining congressional intent, and the cases cited by the Government where the rule was not permitted to control, for the most part were cases where the terms of the statute were declared to be unambiguous. There is no such contention in this case. The paragraph involved is filled with ambiguity, which ambiguity has led this court into the anomalous position it now finds itself in.

In probably the last opinion written by the late Chief Justice Taft, and announced by Mr. Justice Van Devanter, in *United States* v. *Jackson*, 280 U. S. 183, 196, the following strong language was used, which we regard as very pertinent to the question at bar:

\* \* \* If there were any doubt on the question, the silence of Congress in the face of the long continued practice of the Department of the Interior in construing statutes which refer only to Indian "allottees," or Indian "allotments," as applicable also to Indians claiming under the homestead laws, must be considered as "equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress." *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 481.

The Supreme Court of the United States, as early as 13 How. 273, in *DeForest* v. *Lawrence*, gave controlling effect to legislative adoption of administrative practice, and where there has been doubt as to the true congressional intent in tariff enactments, it has consistently applied such rule with controlling effect.

The United States Supreme Court in May, 1931, in *McCaughn* v. *Hershey Chocolate Co.*, 283 U. S. 488, in considering the applicability of a term used in the revenue acts of 1918 and 1921, said:

\* \* \* The provision has been consistently enforced as construed, was reenacted by Congress in the 1921 Act, and remained on the statute books without amendment until its repeal. Such a construction of a doubtful or ambiguous statute by officials charged with its administration will not be judicially disturbed except for reasons of weight, which this record does not present. See *Brewster* v. *Gage*, 280 U. S. 327, 336; *Universal Battery Co.* v. *United States*, 281

U. S. 580, 583; *Fawcus Machine Co.* v. *United States*, 282 U. S. 375, 378. The reenactment of the statute by Congress, as well as the failure to amend it in the face of the consistent administrative construction, is at least persuasive of a legislative recognition and approval of the statute as construed. See *National Lead Co.* v. *United States*, 252 U. S. 140, 146. We see no reason for rejecting that construction.

In *United States* v. *Bassichis Co. et al.*, 16 Ct. Cust. Appls. 410, T. D. 43133, this court stressed with much emphasis the force to be given to the doctrine of legislative approval of judicial decision and administrative practice, and in illustrating when the doctrine might not be controlling mentioned but one instance.

In *Stone & Downer Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 62, T. D. 40019, this court, in its attempt to determine what Congress meant by "clothing wool," relied upon well-settled rules of construction and held that under all the authorities the common meaning of the term "clothing wool" meant a short-staple wool and excluded combing wool. In view of the uniformity of the definitions of the term, and in view of the unambiguous use of the same we felt compelled to give it its ordinary meaning and strictly construe the statute. The Supreme Court of the United States, however, in *United States* v. *Stone & Downer Co.*, 274 U. S. 225, upon appeal of a case involving the same issue, reversed our holding and held that we had not arrived at the correct intent of the legislature and that Congress did not intend to exclude combing wool by the use of the term "clothing wool." The history of the times, the condition of the wool industry, and the necessity for protection as against the importation of combing wool, were referred to in the decision in arriving at the intent of the legislature. The court, through Chief Justice Taft, said:

In this case, as in every other involving the interpretation of a statute, the intention of Congress is an all important factor. The greatest light is thrown on that intention in this case by an examination of the existing conditions and the anticipated evils against which by this legislation Congress sought to protect the country.

After reasoning that Congress could not have reasonably intended the meaning we gave the term, the opinion further states:

If the language of the statute is such that such results can not be avoided, of course it must be enforced accordingly. If Congress by its language has made a mistake, and so has failed in its purpose, this court can not supply by its decision the omission of a necessary legislative provision to effect its purpose. With the intent of the act clearly in mind, however, we must see whether it is true that the language used can only bear the construction insisted upon by the importers and upheld by the Court of Customs Appeals, or whether there is a broader and more reasonable construction that can be fairly placed upon the statute which will serve the plain congressional purpose.

Applying this reasoning to the case at bar, could Congress reasonably have contemplated by the paragraph in controversy to have required an importer of dressed dogskins, uncut and unsewed, to pay

25 per centum ad valorem duty on the same and at the same time to have intended only a 10 per centum duty on the same kind of dog-skins when cut and sewed together in the form of a mat or a plate? Unless reasons are shown, or unless they are obvious, we should not attribute such a purpose to the legislature and we should find a way, if possible, to arrive at a construction of the provision that will not attribute to Congress a purpose so out of harmony with the well-settled policy of tariff legislation.

We believe the judgment of the United States Customs Court, sustaining the protest and holding the merchandise to be dutiable at 10 per centum ad valorem, was correct and should be *affirmed*.